**UNITED STATES of America**

v.

**Peter J. CAMIEL, et al.**

**Crim. No. 80–161.**

United States District Court,
E. D. Pennsylvania.

Aug. 4, 1981.

Peter F. Vaira, U. S. Atty., E. D., Frank H. Sherman, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Nicholas J. Nastasi, Philadelphia, Pa., for Camiel.

Donald J. Goldberg, Philadelphia, Pa., for Fumo.

John P. Joyce, Pittsburg, Pa., for Nolan.

## MEMORANDUM

CLIFFORD SCOTT GREEN, District Judge.

A forty-four count indictment charged defendants Peter J. Camiel, Vincent J. Fumo, Thomas M. Nolan and Vincent F. Scarcelli with violating the federal mail fraud statute, 18 U.S.C. § 1341.[1] At times relevant to the indictment Mr. Camiel was Chairman of Philadelphia Democratic County Executive Committee ("City Committee"); Mr. Fumo was his assistant in charge of patronage; Mr. Nolan was Majority Leader of the Pennsylvania Senate and in charge of the Senate Special Leadership Account ("Senate Payroll") and Mr. Scarcelli was Chief Clerk of the Pennsylvania House of Representatives and in charge of the House Per Diem Account and the House Staff Salary Account ("House payrolls"). The indictment alleged that defendants, together with others known and unknown including Henry J. Cianfrani, then a state senator from Philadelphia, and Martin Weinberg,[1a] Mr. Camiel's successor as Chairman of City Committee, participated in a scheme to defraud the Commonwealth of Pennsylvania and its citizens by placing Democratic Party loyalists as "no show" employees on the Senate payroll and the

---

1. Mr. Camiel was charged in thirteen counts, Mr. Fumo in fifteen counts, Mr. Nolan in thirty-two counts and Mr. Scarcelli in twelve counts.

1a. Mr. Weinberg was not named in the indictment. In response to a motion for a bill of particulars, the government identified him as an unindicted co-schemer.

House payrolls and paying them even though they did no work for the Pennsylvania legislature. After a four week trial, a jury convicted Mr. Nolan on thirty-two counts, Mr. Fumo on fifteen counts and Mr. Camiel on eleven counts but acquitted him on two counts.[2]

At the conclusion of all the evidence, defendants moved, pursuant to Fed.R. Crim.P. 29, for a judgment of acquittal; I reserved decision on these motions. After the jury returned its verdict, the defendants filed post-trial motions, seeking alternatively judgment of acquittal, arrest of judgment or a new trial. Both sets of motions are now before me. For the reasons discussed below, I will enter judgments of acquittal on behalf of defendants Camiel, Fumo and Nolan.

## I. PREJUDICIAL VARIANCE.

In one motion or another, each of the defendants has argued that because there is a material variance between the allegations of the indictment and the proof at trial I must grant either a judgment of acquittal or a new trial.[3] All of the defendants have maintained throughout the proceedings in this case that they were not involved in any scheme to defraud, and that the government could not prove and in fact did not prove their participation in any fraudulent or unlawful scheme. However, the defendants have argued, in the alternative, that if the government proved any scheme it was not the scheme described in the indictment.

The indictment alleged that defendants and other unindicted co-schemers participated in a single mail fraud scheme existing from December, 1974 to December, 1978 and involving both the Senate payroll, supervised by Mr. Nolan, and the House payrolls, supervised by Mr. Scarcelli. In pretrial motions for severance and for relief from prejudicial joinder, all of the defend-

ants, except Mr. Fumo, challenged the government's contention of a single scheme. In subsequent motions, they have continued their attack on the single scheme theory.

From the outset, it has been the position of the defendants that political and personal differences existing among the alleged co-schemers made their participation in a single scheme unthinkable and impossible. It is undisputed that during the period covered by the indictment, 1974 to 1978, Mr. Camiel and his then protege, Vincent Fumo, were engaged in a bitter political feud with alleged co-schemers, Messrs. Cianfrani and Weinberg, who were partisans of former Philadelphia Mayor Frank Rizzo. In May, 1976, Martin Weinberg, the candidate of Mayor Rizzo, defeated Mr. Camiel in his bid for re-election as Chairman of City Committee. By June 30, 1976, Messrs. Camiel and Fumo, while remaining Democratic Ward Leaders, had lost their positions and their power at City Committee. Evidence produced at the trial also suggested that Mr. Nolan and Mr. Fumo were unlikely allies. When Nolan took over as Senate Majority Leader in 1975, he fired Mr. Fumo from a position he had held on the Majority Leader's staff.

Given these circumstances, defendants argue that a unitary scheme among these participants was impossible. In their view, if there were any scheme at all, and they deny that there was, there were at least two: a Camiel-era scheme, lasting from December, 1974 to June 30, 1976, and a Weinberg-era scheme, existing from June 30, 1976 to December 31, 1978. In addition, the defendants contend that since the government did not produce any evidence connecting the Senate payroll of Senator Nolan with the House payrolls of Chief Clerk Scarcelli, there were probably four schemes: A Camiel-era scheme in the Senate and one in the House as well as a Weinberg-era scheme in the Senate and one in the House.

**2.** Because he was hospitalized shortly before the trial commenced, the charges against Mr. Scarcelli were severed. His case has not yet come to trial.

**3.** In his Rule 29 motion made at the end of the government's case and renewed at the close of

all evidence, Mr. Camiel requested a judgment of acquittal on the basis of prejudicial variance. In post-trial motions, Mr. Nolan has argued that the prejudicial variance in this case requires a judgment of acquittal while Mr. Fumo alleges that it is a basis for a new trial.

It is the defendants' contention that the evidence produced at trial by the government in fact supported their theory of multiple schemes. Mr. Camiel has described this evidence as follows. By June 30, 1976, the five employees[4] on the Senate payroll recommended by City Committee during Camiel's tenure had been removed at the direction of Senator Cinfrani. For nearly two months, with the exception of Ann Moss, who was sponsored by Henry Cianfrani, City Committee did not recommend people to Senator Nolan for employment. On or about August 16, 1976, Mary Jane Starry, administrative aide to Senator Nolan, met with Messrs. Cianfrani and Weinberg to discuss people to be placed on the Senate payroll. Thereafter, four of the five people dropped from the payroll on June 30, 1976, were restored and a number of new people,[5] recommended by Weinberg and Cianfrani, were placed on the payroll. Mr. Camiel argues that this evidence confirmed the termination of one scheme and the commencement of another.

Defendants contend there is no evidence to support a finding of the scheme alleged and also that they have been prejudiced substantially because the variance between the single scheme alleged and the multiple schemes revealed by the evidence caused a "spill-over" of evidence.[6] That is, in attempting to prove the single scheme, the government presented overlapping evidence of several different but similar schemes. Such evidence, it is argued, confused the jury so that it could not separate out which evidence applied to which defendant. Mr. Camiel argues that the government's refusal to present the evidence in chronological order further exacerbated the problem.

In its response, the government does not address the issue of prejudice because it maintains that its evidence at trial proved the scheme alleged in the indictment. Drawing on principles of conspiracy law,[7] the government has compared this mail fraud scheme to a wheel conspiracy, with City Committee at its hub. It concedes that not all participants were in the scheme throughout its four year life nor were they necessarily aware of each other's participation. For example, by the government's own account unindicted co-schemers, Henry Cianfrani and Martin Weinberg, did not join the scheme until after Mr. Camiel was ousted from the Chairmanship of City Committee in May, 1976.[8] Similarly, there is no evidence that Mr. Nolan in the Pennsylvania Senate and Mr. Scarcelli in the House of Representatives were aware of one another's activities. Nonetheless, the United States argues that there was a single scheme with City Committee at the center and the various participants united by a common goal: the aggrandizement of their own political power by rewarding Democratic loyalists with "no show" jobs with the Pennsylvania General Assembly.

My analysis of the variance issue presented here properly begins with *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In *Kotteakos*, the Supreme Court reversed the convictions of appellants for violations of the general federal conspiracy statute and certain provisions of the National Housing Act. The indictment alleged a single conspiracy involving thirty-six co-conspirators who

---

4. These employees were John Bonner, Jr., Angelina France, Lester Maglietta, Loretta Montgomery and Joseph Scaruzzi.

5. This group included Margaret Coyle, Mary DelRossi, and Evangelina Domenico.

6. In his post-trial motion and memorandum, Mr. Nolan makes a two part variance argument. First, he claims that while the indictment tied him, a senator from Pittsburgh, to Democratic politics in Philadelphia, the evidence at trial failed to establish this connection. Second, he argues that the government failed

to prove any link between employment decisions in the Pennsylvania House and those in the Senate, as was alleged in the indictment.

7. The parties agree that a multidefendant mail fraud scheme can be analyzed like a conspiracy. *See United States v. Cohen*, 516 F.2d 1358, 1364 (8th Cir. 1975); *United States v. Dukow*, 330 F.Supp. 360, 364 (W.D.Pa.1971), aff'd 465 F.2d 688 (3d Cir. 1972).

8. Assistant United States Attorney Frank Sherman made this concession during oral argument on the post-trial motions.

shared a common purpose: to obtain loans from the Federal Housing Administration (FHA) by submitting loan applications containing false and fraudulent information. The only individual common to all the fraudulent transactions proved at trial was one Simon Brown. Mr. Brown acted as a broker to the others, assisting them in making false and fraudulent applications for FHA loans. By the time the case reached the Supreme Court on appeal, the United States was willing to concede that the evidence showed a number of distinct conspiracies rather than the single conspiracy charged. Nonetheless, it argued that the variance amounted to harmless error, not requiring a reversal of the defendants' convictions. The Supreme Court disagreed, finding that the variance prejudiced the "substantial rights" of the appellants " . . . not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others . . ." 66 S.Ct. at 1253. The Court was concerned with the "spillover" of evidence from one conspiracy to another and a jury's tendency to transfer the guilt of a person involved in one conspiracy to another involved in an unrelated conspiracy, the very issue raised by defendants in the instant case.

■ *Kotteakos* and the line of cases following it teach that analysis of a variance question requires a two step inquiry: (1) is there in fact a variance and (2) if so, did it prejudice a substantial right of the defendant. I find that there is a variance between the allegations of the indictment and the evidence produced at the trial in this case. The United States has likened this mail fraud scheme to a "hub" or wheel conspiracy. This type of conspiracy is based, as the name suggests, on a wheel metaphor. At the hub or core is a group or individual who has agreements or transactions with other groups or individuals, unrelated to each other, the so-called spokes of the wheel. A wheel conspiracy must have a "rim" which binds the "hub" and "spokes" into a single conspiracy. In the instant case, the government has identified City Committee as the hub of the mail fraud scheme and the payrolls in the Senate and House as well as the shifting leadership of City Committee as the spokes. The rim or binding force of the scheme, according to the United States, was the common goal of the co-schemers: to increase their political power by rewarding Democratic Party loyalists with "no show" jobs on Pennsylvania legislative payrolls.

Given the evidence of record, however, the government has failed to prove its theory of a single, multi-participant mail fraud scheme similar to a hub conspiracy. The first problem is the government's failure to identify a group or individual who served as the hub or core of the scheme. By the prosecution's own account, none of the major participants in the scheme were at the center of the scheme throughout its existence. Messrs. Cianfrani and Weinberg did not join the scheme until after the ouster of their political opponent, Peter J. Camiel, as Chairman of City Committee. According to the government, after being deposed as Chairman, Mr. Camiel remained in the scheme only as a "bit player" and because he failed to take affirmative steps to withdraw. Only defendants Nolan, Scarcelli and Fumo allegedly participated in the scheme throughout its four year existence; however, none of them could be described as the hub, and the government has never suggested any of them for this part. There is no evidence, and the government has never argued, that Mr. Nolan as Senate Majority Leader in charge of the Senate payroll and Mr. Scarcelli as Chief Clerk of the Pennsylvania House of Representatives in charge of the House payrolls were even aware of each other's participation in a common scheme to place "no show" employees on legislative payrolls. As for Mr. Fumo, while he was charged with participating in the scheme as it related to both the Pennsylvania House and Senate and both before and after June 30, 1976, the government has never suggested that he served as the hub of the scheme. Mr. Fumo

was a political ally of Peter Camiel and acted as his patronage chief until Mr. Camiel lost his position as Chairman in May, 1976. After June, 1976, Mr. Fumo had no position or power at City Committee; he remained active in the scheme only in his role as Democratic Ward Leader of Philadelphia Ward 39A.

The government apparently recognizes that there is no one individual or group of individuals who can be said to have been the hub of this mail fraud scheme. Adopting some language I used during a hearing on one of the motions in this case, the United States contends that City Committee as an institution was the hub. In my view, however, this theory is seriously flawed. First, the government has not cited nor am I independently aware of any case which holds that an organization *qua* institution, rather than as a collection of particular individuals, can serve as the hub of a conspiracy. However, *assuming arguendo* that an organization such as City Committee could serve that function, the government has not produced sufficient evidence to prove an institutional conspiracy in this case. In my view, to establish a conspiracy centered *not on an individual or group of individuals but on an organizational entity*, a longstanding involvement by the organization in the conspiracy must be shown. Here, there has not been a showing, indeed it is not even alleged, that persisting over a number of years through a succession of chairmanships City Committee

was the nucleus of a scheme to place "no show" employees on legislative payrolls. Rather, the scheme as alleged in the indictment was limited to a four year period and involved only part of the chairmanships of Peter Camiel and Martin Weinberg.[9] Accordingly, the supposed wheel conspiracy in this case lacks a hub.

Similarly, there is no "rim" binding the spokes together into one scheme. It is the government's contention that the common goal of the co-schemers of attempting to increase their political power by rewarding their supporters with "no show" jobs provided this conspiracy with a "rim."[10] Given the evidence of political and personal enmity existing among those who have been identified as the principal co-schemers, the claim that they shared a common goal and were involved in a common endeavor lacks supports. While it seems highly probable that as politicians each of these individuals was interested in increasing and consolidating his personal political power, it does not follow that their interests were congruent or even complementary. Indeed, the political ambitions and aims of Messrs. Camiel and Fumo on the one hand and Messrs. Cianfrani and Weinberg on the other were diametrically opposed. Mr. Camiel may have sought to consolidate his power by offering patronage jobs to his supporters. However, because he was engaged in a struggle with former Mayor Rizzo for control of the Democratic Party in Philadelphia, the undisputed evidence reveals that

---

**9.** Mr. Camiel began his tenure as Chairman of Philadelphia City Committee in 1970 (N.T. 10/15/80 at 103), and Mr. Weinberg did not leave the chairmanship until 1980.

**10.** The United States cites two Third Circuit cases, *United States v. Ellis*, 595 F.2d 154 (3d Cir.), *cert. denied*, 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49 (1979) and *United States v. Boyd*, 595 F.2d 120 (3d Cir. 1978), each of which upheld a finding of a single conspiracy based on the common goal shared by co-conspirators. However, both these cases are distinguishable from the instant one.

The *Ellis* case involved the prosecution and conviction of six Philadelphia police officers for conspiracy to violate the civil rights of certain

people they had beaten during interrogation regarding a firebombing murder of five people. The Court of Appeals found that the defendant police officers had been aware of each other's activities, had met outside the interrogation rooms to discuss what they had learned from the people they were questioning and in some cases had moved from one witness or suspect to another.

*United States v. Boyd* involved a conspiracy to manufacture and distribute methamphetamines. The evidence revealed a classic wheel conspiracy with a core group of individuals who remained at the hub throughout while others joined or withdrew from the conspiracy.

his goal was at cross purposes with the aims of Cianfrani and Weinberg, who were allies of Mayor Rizzo. That Camiel, Fumo, Nolan, Weinberg, Cianfrani and Scarcelli shared an interest in political power or even that each had used "no show" jobs with the Pennsylvania legislature as a means of increasing his power does not prove that they acted as co-schemers in the single scheme alleged.

Generally, the determination of the number of conspiracies involved is a fact question for the jury. *United States v. Varelli*, 407 F.2d 735, 746 (7th Cir. 1969), *cert. denied* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972). However, if, viewing the evidence in the light most favorable to the government, there is not substantial evidence of a single conspiracy, I cannot uphold the jury verdict. *United States v. Palmeri*, 630 F.2d 192, 203 (3d Cir. 1980). I instructed the jury that they could not find the defendants guilty unless they found the government had proven beyond a reasonable doubt the single scheme stated in the indictment. Apparently, the jury found the government had carried its burden. However, viewing the record in the light most favorable to the United States, I find that this determination is not supported by substantial evidence.

■ Having determined that there was a variance between the allegations of the indictment and the evidence produced at trial, I turn now to the question of whether any "substantial rights" of the defendants were prejudiced by this variance. Defendants contend that the prejudice in this case derived from the "spillover of evidence" from one scheme to another. It is their position that given the number of witnesses, the large amount of evidence, the similarities between the schemes and the government's claim of a unified scheme, the jury could not and did not compartmentalize the evidence and consider only the relevant evidence in determining the guilt or innocence of each defendant.

I find that a "spillover of evidence" did occur in this case and that as a result defendants were prejudiced significantly. The volume of evidence was substantial; for example, thirty-seven witnesses testified for the government. The government's evidence disclosed as many as four schemes, if it showed any: two existing before June, 1976 (one in the Senate and one in the House) and two after June, 1976 (one in the Senate and one in the House). The United States did not present its evidence in a manner which encouraged or even allowed delineation of these four schemes. Some of the witnesses testified as to events occurring both before and after June, 1976.[11] Because the charges against Mr. Scarcelli were severed before trial, the amount of evidence concerning the House payrolls presented at the trial was relatively small. Nonetheless, at least four witnesses[12] testified regarding the Pennsylvania House payrolls.

Given the manner in which the United States presented its evidence, which after all was premised on a theory of a single scheme, it was impossible for a jury to separate out which evidence applied to which defendant. In terms of sheer volume of evidence, the single scheme theory inured to the government's benefit. By alleging a single scheme in a forty-four count indictment, the United States was able to create the impression that the defendants had been involved in an extensive scheme. It is highly probable that the jury transferred guilt from one defendant to another in this case. Defendants Fumo and Camiel were tainted by evidence concerning events occurring after June, 1976. Similarly, Mr. Nolan was prejudiced by the evidence dealing with the House payrolls supervised by Mr. Scarcelli. However, the greatest mis-

11. *See, e. g.*, the testimony of John Bonner, Jr. (N.T. 10/10/80).

12. These four included Camillo Melchiorre, Ann Santinoceto, Alfred Hammer and Mary Ann DiGiacomo.

chief caused by the government's prosecution of this case as a unified scheme was that it linked the defendants with Henry J. Cianfrani, a convicted felon. Mr. Cianfrani's highly publicized conviction involved abuses of his position as a state senator and Majority Leader of the Pennsylvania Senate. Although Mr. Cianfrani never appeared at defendants' trial, because he was an unindicted co-schemer, there were constant references to him and his misdeeds.[12a] In a sense, the absent Cianfrani became the symbol of the "corrupt politician;" as an unindicted co-schemer, his "corruption" inevitably rubbed off on the defendants. This guilt by association was particularly pernicious because at least as to defendants Camiel and Fumo, the United States did not present evidence establishing their participation in a scheme involving Mr. Cianfrani.

■ Having found a prejudicial variance, I must determine whether the appropriate remedy is a judgment of acquittal or a new trial. Citing several legal authorities,[13] Mr. Camiel argues that a finding of prejudicial variance requires a judgment of acquittal. In his post-trial motions, Mr. Fumo asserts that a prejudicial variance is grounds for a new trial. While there are cases going both ways on this question, the standard for determining whether to grant a judgment of acquittal or a new trial is not clear. First, there is a paucity of cases discussing the issue. Second, those cases which deal with the question offer differing analyses. For example, the Second Circuit, in *United States v. Russano*, 257 F.2d 712, 716 (2d Cir. 1958) and later in *United States v. Bertolotti*, 529 F.2d 149, 158 (2d Cir. 1975) observed that a reviewing court must evaluate a prejudicial variance in the context of the particular case to determine whether a new trial or dismissal of the indictment would be

in the "interests of justice." In *United States v. Eaton*, 501 F.2d 77, 80 (5th Cir. 1974), the Fifth Circuit stated that a finding of a materially prejudicial variance is equivalent to a finding of insufficiency of evidence and thus requires a court to enter a judgment of acquittal.

Viewing the variance in this case in light of these principles, I find that the appropriate remedy is to grant judgment of acquittal in favor of the defendants. First, I do not believe that the "interests of justice" would be served by granting a new trial and permitting the United States to retry this case. From the outset, the defendants have claimed that the government could not prove the single scheme alleged in the indictment. The United States has steadfastly maintained that it could prove the single scheme set out in the indictment. Despite my observations about the possible adverse consequences to the government of its failure to prove at trial the single scheme (N.T. 9/10/80, pp. 20, 69), the government declined to restate the scheme as multiple schemes and elected to try the defendants on the one scheme as alleged. Although it was given every opportunity to prove the scheme alleged in the indictment, the United States has failed. Under these circumstances, the interests of justice would not be served by granting a new trial instead of judgment of acquittal.

The second and more important reason why a judgment of acquittal is appropriate here is that double jeopardy considerations would preclude a new trial of the defendants under the present indictment. As I discussed previously, the government failed to prove that the defendants participated in the unitary scheme described in the indictment. Therefore, as a matter of law, the government's evidence was insufficient to

---

**12a.** As the government attorney pointed out in his closing argument, the defendants made constant reference to Mr. Cianfrani. However, because he was included in the indictment as an unindicted co-schemer and because of his status as a convicted felon, they had to attempt to disassociate themselves from him.

**13.** The authorities cited are *United States v. Eaton*, 501 F.2d 77, 80 (5th Cir. 1974); The Government of the *Virgin Islands v. Aquino*, 378 F.2d 540, 554 (3d Cir. 1967); 2 C. Wright, *Federal Practice and Procedure*, §§ 466, 516 (1969).

prove the crime alleged.[13a] Under the principles stated in *Hudson v. Louisiana,* 450 U.S. 40, 101 S.Ct. 970, 971, 67 L.Ed.2d 30 (1981), and *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978), when a reviewing court has found that the government, having received a "fair opportunity to offer whatever proof it could assemble," did not produce legally sufficient evidence, the Double Jeopardy Clause bars a retrial.

For all of the foregoing reasons, I find that the appropriate remedy to the prejudicial variance in this case is judgment of acquittal.

## II. OTHER ARGUMENTS MADE IN SUPPORT OF JUDGMENT OF ACQUITTAL.

The defendants have presented other theories which they contend require me to grant judgments of acquittal. Many of these arguments challenge the sufficiency of the government's evidence regarding the requisite elements of the crime of mail fraud.[14] For example, Mr. Fumo claims that the government did not produce "substantial evidence" that he acted with a specific intent to defraud. However, as I have determined that the defendants are entitled to judgments of acquittal because the United States failed to prove the scheme alleged in the indictment, I need not reach the question of whether it established the essential elements of the offense as to each defendant. Accordingly, I will not discuss or decide the other arguments made both in support of and in opposition to judgment of acquittal.

---

**13a.** My finding is limited to the scheme alleged in the indictment. I express no opinion on whether the government did or could prove that the defendants had engaged in some other unlawful scheme or schemes.

**14.** In order to prove an offense under 18 U.S.C. § 1341, the government must establish: (1) the existence of a scheme to defraud; (2) the use of the mails in furtherance of the fraudulent scheme and (3) culpable participation by the defendant. *United States v. Pearlstein,* 576 F.2d 531, 534 (3d Cir. 1978). To show the third

## III. MOTIONS FOR NEW TRIAL.

In their post-trial motions, the defendants also have made a number of arguments in support of their request for a new trial. Having carefully considered all of these claims, with one exception, I find them without merit and will not discuss them in this memorandum.[15]

All of the defendants have requested a new trial on the basis that the prosecutor made improper comment during his closing argument regarding the credibility of their testimony at trial. In a number of opinions, the Third Circuit has expressed its disapproval of prosecutorial comment on the veracity of a witness or on the guilt of a defendant. *See, e. g. United States v. Gallagher,* 576 F.2d 1028, 1041–43 (3d Cir. 1978). In *United States v. LeFevre,* the Court of Appeals adopted Standard 5.8(b) of the American Bar Association's Prosecution Standards, which states:

> It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence of the guilt of the defendant.

483 F.2d 477, 478–79 (3d Cir. 1973).

The rationale underlying this limitation on prosecutorial comment was described in *United States v. Schartner* as follows:

> We cannot countenance these remarks. Not only do they imply a personal belief in [the defendant's] guilt, but they also directly invite the jury to rely on the government attorney's experience in prosecuting criminals generally and on the government attorney's 'sincerity.'

---

element, the government must prove that the defendant knew of the scheme and wilfully participated in it. *Id.* at 538.

**15.** The principal argument made by Mr. Camiel in his post-trial motions is that he is entitled to a new trial because his trial counsel had a conflict of interest which adversely affected his representation. I have addressed this issue in a separate memorandum.

426 F.2d 470, 478 (3d Cir. 1970).

 However, the Third Circuit does not require a new trial in every case where the government attorney has made improper remarks. The Court distinguishes between comments based on information outside the record and those based on the evidence. The former amounts to reversible error per se, but remarks concerning evidence of record, such as are at issue in this case, do not require a grant of a new trial absent a showing of prejudice to the defendant. *United States v. Swinehart*, 617 F.2d 336, 341 (3d Cir. 1980). Even if the defendant establishes that the prosecutor's remarks were prejudicial, reversal may not be required because the prejudice can be cured by the instructions of the judge and by the fact that there was overwhelming evidence to support the conviction.[16]

With these principles in mind, I turn now to the allegedly improper statements made by the government attorney in this case, Jack Meyerson. The transcript reveals that the prosecutor commented on the veracity of the defendants' testimony twelve times during his closing argument. His remarks were as follows:

> The explanation that each of these three defendants has given as to their involvement in these letters, frankly, *is just not truthful* and cannot be accepted by you.
> (N.T. 10/22/80 p. 63)

> \* \* \* \* \* \*

> If you *listen to these defendants lie enough,* you are going to find that this case not only involves ghost payrollees; it apparently involves ghost conversations...[17]
> (N.T. 10/22/80, p. 65)

> \* \* \* \* \* \*

Let me enumerate some of those contradictions for you because I submit *Mr. Camiel was not truthful* in discussing with you what his relationship was with Senator Nolan.
(N.T. 10/22/80, p. 73)

\* \* \* \* \* \*

In any event, with regard to G–1, *what Mr. Camiel has told you simply, I suggest to you, cannot be believed...*
(N.T. 10/22/80, p. 76)

Let me review those letters with you again and tell you what Mr. Fumo's position on each of them is and *tell you why in fact that position is not credible and that he has not been candid with you.* What suggests *that he [Fumo] hasn't been truthful* about this first letter?
(N.T. 10/22/80, p. 93)

... I will suggest to you that each and every one of these six letters were dictated by Mr. Fumo; and *when Mr. Fumo tells you otherwise, he is not being truthful.*
(N.T. 10/22/80, p. 96)

\* \* \* \* \* \*

Each of these letters was dictated by Vincent Fumo. *When he denies that fact, he is not being honest with you.* ... and I suggest when a lawyer [Mr. Fumo] comes before you and makes that argument, *it's really incredible.*
(N.T. 10/22/80, p. 98)

\* \* \* \* \* \*

I suggest to you that Mr. Nolan is well aware of the fact he can't hire them and have them be working at Democratic City Committee, and he knows that's what

---

**16.** Language in *United States v. Gallagher*, 576 F.2d 1028, 1042 (3d Cir. 1978) suggests that prejudice can be cured either by instructions or by overwhelming evidence. However, in a more recent opinion, *United States v. Swinehart*, 617 F.2d 336, 340 (3d Cir. 1980), the Court implies that the prejudice can be corrected only by a combination of curative instructions and overwhelming evidence.

**17.** The government claims that this statement was improperly transcribed and that the Assistant United States Attorney said "long enough" not "lie enough". The stenographer has restated her belief in the correctness of the transcription, and the government has not moved for a correction of the record.

**1248**

happened and that's why time and time again *he has given you implausible or untruthful testimony.*

(N.T. 10/22/80, p. 99)

\* \* \* \* \* \*

Now we have a very *implausible denial from Mr. Nolan* that he ever accepted City Committee recommendations.

(N.T. 10/22/80, p. 100–01)

\* \* \* \* \* \*

... all he [Nolan] could tell you is what was his standard refrain, *that I suggested to you is incredible,* 'well, I only did what Cianfrani told me to do.'

(N.T. 10/22/80, p. 102)

██ *U. S. v. Gallagher, supra,* and the other Third Circuit cases discussed previously make it clear that these comments were improper. I believe that the defendants were prejudiced by the persistence, evidenced by the number of remarks, with which the government attorney questioned their credibility. The United States argues that any prejudice caused by these statements was cured by the overwhelming evidence of defendants' guilt and by my instructions to the jury. I disagree.

First, since I have found that the government failed to produce sufficient evidence of the scheme alleged in the indictment, I cannot characterize the evidence against the defendants as overwhelming. Second, while it is true that I instructed the jury that the statements and arguments of counsel are not evidence in the case (N.T. 10/23/80, p. 16) and that they, the jurors, were the sole judges of credibility (N.T. 10/23/80, pp. 6, 18), I cannot find that my instructions were sufficient to overcome the substantial prejudice created by the prosecutor's repeated statements of disbelief of the defendants.

Therefore, if the defendants were not entitled to a judgment of acquittal or new trial on the variance issue, they would be entitled to a new trial on the basis of improper prosecutorial statements.