UNITED STATES of America, Appellee,

v.

Larry ESDAILLE, Defendant-Appellant.

No. 85–1025.

United States Court of Appeals,
Second Circuit.

Argued May 28, 1985.

Decided Aug. 1, 1985.

Barry Bassis, The Legal Aid Society, New York City, N.Y., for defendant-appellant.

Viktor V. Pohorelsky, Asst. U.S. Atty., New York City, N.Y. (Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., Stuart E. Abrams, Asst. U.S. Atty., New York City, N.Y., on brief), for appellee.

Before KAUFMAN and KEARSE, Circuit Judges, and MISHLER, District Judge.[*]

KEARSE, Circuit Judge:

Defendant Larry Esdaille appeals from a judgment entered in the United States District Court for the Southern District of New York after a jury trial before Charles S. Haight, Jr., *Judge*, convicting him on three counts of narcotics violations: conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846 (1982), distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) (1982), and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (1982). He was sentenced to two years' imprisonment on each count, to be served concurrently, and a special parole term of three years following completion of his prison term. On appeal, Esdaille contends principally that the trial court erred in its refusal to permit him to refute a law enforcement agent's identification of him by demonstrating to the jury, without exposing himself to cross-examination, that he had a heavy Caribbean accent. Finding no merit in Esdaille's arguments, we affirm.

## I. BACKGROUND

The evidence presented by the government consisted primarily of the testimony of New York City undercover police officer Jose Santiago, who testified that he had purchased cocaine from Esdaille, and the two policemen who thereafter arrested Esdaille. An issue raised at the trial was the identification of Esdaille as the person from whom Santiago had purchased the cocaine.

### A. *The Events*

Taking the evidence in the light most favorable to the government, the facts were as follows. At about 7:00 p.m. on August 21, 1984, Santiago approached Esdaille and another man and, posing as a narcotics user, asked Esdaille where he could get some "blow," street slang for cocaine. Esdaille asked Santiago how much he wished to purchase and Santiago replied, "How much you got?" Esdaille said, "I could get you whatever you want." Santiago indicated that he wanted half a gram, for which he would pay $50. Esdaille said he would take Santiago to a place to get the cocaine if Santiago would give him $3. Santiago offered $2 and Esdaille agreed. The man with Esdaille assured Santiago that the cocaine that Esdaille would supply was of very high quality.

Leaving the other man behind, Esdaille then led Santiago to the second floor of a tenement two blocks away. Santiago paid Esdaille $50 in marked bills for the cocaine, and Esdaille instructed Santiago to wait at the top of the stairs. As Santiago watched, Esdaille went to an apartment door on the second floor and knocked. A voice from within the apartment asked who was at the door; Esdaille responded and was let in.

While Santiago waited in the hallway, one Bienvenido Cuevas, who was eventually indicted with Esdaille, entered the building. When Cuevas reached the second floor, he too knocked on the apartment door and, after giving his name, entered the apartment, leaving the door slightly ajar. Santiago then overheard a conversation among three male voices. One said,

---

[*] Honorable Jacob Mishler, Senior Judge of the United States District Court for the Eastern District of New York, sitting by designation.

"There's a guy in the hallway, who is he with?" Another responded, "He's with him," and the third stated, "Yes, he's waiting for me." A short time later, Esdaille emerged from the apartment and gave Santiago a tin-foil packet containing cocaine. Santiago gave Esdaille $2 as they had agreed.

Santiago and Esdaille walked to the corner, where they parted company. Santiago went to his car and radioed other members of his unit a description of Esdaille (a black male, approximately 5'–7" tall, wearing jeans and a black shirt with red tips on the collar), and the location where he had last seen Esdaille. The other officers were initially unable to locate Esdaille. Within five minutes, however, Santiago spotted him near the corner where he had left him. Santiago radioed the information to his team and watched as the officers arrested Esdaille.

Immediately thereafter, Santiago returned to the building where Esdaille had sold him the cocaine and observed Cuevas and one Alberto Guzman, also eventually indicted with Esdaille, in front of the building engaging in what appeared to be narcotics transactions with persons who stopped by. Cuevas and Guzman were arrested; Cuevas was found to have in his possession $20 of the marked money Santiago had paid to Esdaille.

Later that evening, following issuance of a search warrant, the apartment from which Esdaille had supplied Santiago with the cocaine was searched. The apartment contained no signs of habitation, virtually no furniture, and no operable appliances or plumbing. The search revealed money, a small quantity of cocaine, a scale, and other narcotics paraphernalia.

### B. The Identification Question at Trial

In response to questioning on cross-examination, Santiago testified that he did not recall whether the person who sold him the cocaine had spoken with any distinctive accent. One of the arresting officers testified that on the way to the police station Esdaille had spoken with a Caribbean accent but that it was slight.

Esdaille then sought to introduce an exemplar of his voice by reading a portion of a newspaper article in order to prove that he in fact spoke with a heavy Caribbean accent. He contended that his accent was so thick that Santiago would have noticed and recalled it and that since Santiago did not remember it, the jury should infer that Esdaille was not the person who had sold Santiago the cocaine. Esdaille requested a ruling that such an exemplar would not be testimonial and hence would not expose him to cross-examination by the government.

The trial court, citing Fed.R.Evid. 403 and *United States v. Lam Muk Chiu*, 522 F.2d 330 (2d Cir.1975) (per curiam), refused to allow Esdaille to present the exemplar as nontestimonial evidence, on the grounds that the exemplar would have little probative value because it was inherently suspect, and that its probative value was outweighed by prejudice to the government in light of both the ease with which Esdaille could deliberately alter his accent and the inability of the government to test the reliability of the accented reading. Thereafter, Esdaille called one witness, Lawrence Rogers, a schoolmate of Esdaille in the Virgin Islands who had seen him in New York during the past several years. Rogers, who himself spoke with a Caribbean accent, testified that Esdaille's accent was heavier than Rogers's.

The jury found Esdaille guilty on the three counts with which he was charged and he was sentenced as indicated above.

### II. Discussion

Esdaille challenges his conviction principally on the ground that he was denied due process by the trial court's refusal to permit him to present his accent exemplar at trial without subjecting himself to cross-examination. In addition, he contends that the evidence on the counts charging him with possession of and conspiracy to distribute cocaine was insufficient to convict him. We disagree.

## A. *The Proposed Exemplar*

In support of his contention that the trial court denied him due process in refusing to permit him to give an exemplar at trial without exposing himself to cross-examination, Esdaille argues that a voice exemplar displays an identifying physical characteristic in a way that is not testimonial and that, as the government would have been allowed to require him to give such an exemplar on the theory that it is not testimonial, it was unfair not to permit him the same right. He relies on the rulings in such cases as *United States v. Bay,* 748 F.2d 1344 (9th Cir.), *modified on rehearing,* 762 F.2d 1314 (9th Cir.1985); *People v. Shields,* 81 A.D.2d 870, 438 N.Y.S.2d 885 (2d Dep't 1981); and *State v. Tillett,* 351 So.2d 1153 (La.1977). We conclude that these cases are distinguishable and that the trial court did not abuse its discretion in refusing to allow the exemplar without Esdaille's subjecting himself to cross-examination.

First, the matter of whether an act is testimonial or not bears on whether a person may be compelled, consistent with his Fifth Amendment right to avoid self-incrimination, to perform that act; but the fact that exhibition of a physical characteristic is not testimonial in nature, and hence may be compelled at some stage, does not require its admissibility into evidence. A defendant's presence in a lineup, for example, is a nontestimonial act, *United States v. Wade,* 388 U.S. 218, 221–23, 87 S.Ct. 1926, 1929–30, 18 L.Ed.2d 1149 (1967); but an identification resulting from that lineup is not automatically admissible in evidence. If, in the lineup, the defendant was the only person who came close to matching the witnesses' descriptions of the culprit, or if the procedures preceding the lineup were unfairly suggestive of the defendant as the culprit, a resulting identification of the defendant as the perpetrator may be so unreliable that the identification is inadmissible. *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). The district court properly focused principally, therefore, as required by *United States v. Lam Muk Chiu,* not on whether the proposed exemplar was testimonial but on whether it was reliable.

We agree with the court's view of the proffered heavy-accent exemplar as a type of evidence that has significantly less inherent trustworthiness than the types of physical evidence that courts have ruled the defendant should have been allowed to submit without exposure to cross-examination. In *Shields,* for example, the New York court reversed a conviction on grounds that the defendant should have been allowed to exhibit to the jury a 14- to 16-inch scar that had not been mentioned by the complaining witness. The court characterized the corporeal injury as "real evidence," suggesting that, since the defendant also proffered hospital records showing that the scarring injury antedated the crime, there was no possibility of the scar's not being authentic. Similarly in *Bay,* the Ninth Circuit dealt with a defendant who had sought to show the jury the tattoos on the backs of his hands in order to counter the evidence of witnesses who identified him and testified that they had seen his hands but did not mention having noticed tattoos. The court ruled that, if a foundation were laid showing that the tattoos were in fact on Bay's hands at the time of the robberies, these physical characteristics, which it had characterized as relatively "permanent," *see* 748 F.2d at 1346–47, would be admissible without the defendant's having to take the witness stand and subject himself to impeachment. 762 F.2d at 1315–17.

Unlike a visible scar or a permanent tattoo, however, a regional accent is a manner of speaking that need be neither permanent nor genuine. One need only have heard an impersonator perform to know that accents can be feigned or deepened. Thus, we view an exemplar designed to show that the speaker had a deeper accent than had been described as having less trustworthiness than an exemplar to show, for example, voice quality or timbre.

We are not persuaded by the *Tillett* case to reach the contrary result. There the

Louisiana Supreme Court reversed a conviction because the defendant had been denied the opportunity to present a nontestimonial exemplar of his voice to show that he had *no* accent. We think it significantly more difficult for a person to feign the absence of an accent if he normally speaks with one than either to feign the existence of an accent when he has none or to deepen an admittedly existing accent. Consequently, the exemplar offered by *Tillett* was significantly more trustworthy than the exemplar proffered by Esdaille.

In addition, *Tillett* is distinguishable because there the prosecution witnesses had testified that the masked person who robbed them had a Spanish accent and the existence of that accent was relied on as part of the means of identifying the defendant as the culprit. In the present case, Santiago did not rely at all on any accent or speaking patterns in identifying Esdaille; he had dealt with the narcotics seller face-to-face and had described the culprit and the clothing worn to the backup officers; and although those officers lost sight of the culprit, within five minutes Santiago saw him again and he was arrested. There is no contention that Esdaille did not match exactly, in both stature and clothing, the description that Santiago had just given. We do not suggest by this observation to suggest that the evidence proffered by Esdaille of a heavy accent was not relevant. Notwithstanding Santiago's lack of reliance on the existence of an accent in his identification of Esdaille as the person from whom he bought the cocaine, Esdaille was entitled to argue that his accent was so heavy that Santiago could not have helped noticing it if Esdaille had been the seller. We simply conclude that, in the circumstances, the relevance of the depth of the accent was slight.

■ Rule 403 of the Federal Rules of Evidence gives the trial judge broad discretion to exclude even relevant evidence if its probative value is substantially outweighed by the danger that it will unfairly prejudice the other side or mislead the jury. *See United States v. Robinson,* 560 F.2d 507,

513–14 (2d Cir.1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). Because the trial judge is in a superior position to evaluate the likely impact of the evidence, since he sees the witnesses, the parties, the jurors, and the attorneys, and their mannerisms and reactions, we will not overturn his evidentiary rulings unless he has acted arbitrarily or irrationally. *Id.* at 514–15; *United States v. Pedroza,* 750 F.2d 187, 201 (2d Cir.1984).

■ In the present case, the probative value of the proposed exemplar was slight, given both its tangential relevance to Santiago's visual identification of Esdaille as the culprit and the fact that Esdaille was allowed to present the testimony of an acquaintance to support his assertion that he had a heavy accent. In light of the lack of inherent trustworthiness of Esdaille's exemplar to show a heavy accent and the difficulty in testing the authenticity of the accent displayed, the trial judge did not err in concluding that there was a possibility that the government would be unfairly prejudiced or the jury misled. His conclusion that these possibilities substantially outweighed the slight probative value of the proposed exemplar was neither arbitrary nor irrational.

#### B. *Sufficiency of the Evidence*

■ Esdaille's contention that the trial evidence was insufficient to convict him of possession of cocaine with intent to distribute and of conspiracy to distribute cocaine need not detain us long. An appellant challenging the sufficiency of evidence carries a "very heavy burden." *United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Young,* 745 F.2d 733, 762 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). Ample evidence was adduced to show that Esdaille assured Santiago that he could obtain as much cocaine as he might want. He led

Santiago directly to the apartment in which the cocaine was kept, and was overheard discussing Santiago's identity with the other occupants of the apartment. Esdaille delivered the cocaine to the officer as previously agreed. Finally, twenty dollars of pre-recorded "buy money" that Santiago had paid Esdaille was found in the possession of coconspirator Cuevas. In light of the government's showing, we believe the jury could reasonably have found that Esdaille participated in the conspiracy and that he maintained constructive possession of the cocaine found in the apartment.

Our recent decision reversing a narcotics conspiracy conviction in *United States v. Tyler*, 758 F.2d 66 (2d Cir.1985), relied on by Esdaille, is distinguishable. There we noted that the defendant, after telling the purchaser that he would get him some good drugs, "encountered" an individual whom he took aside, and that individual then consummated a deal with the buyer. *Id.* at 68. We noted that

> [c]onspicuously absent from this scenario is any evidence that Tyler asked Baxter how much heroin he sought to purchase, that Tyler indicated that he had a specific source of heroin in mind for Baxter, that Tyler knew where to find Bennett or expected him to be in the area, or that Tyler had made any previous deals with Bennett.

*Id.* at 68–69 (footnote omitted). Those very pertinent facts are conspicuously present in this case.

We have considered all of Esdaille's other arguments on this appeal and have found them without merit.

### CONCLUSION

The judgment of conviction is affirmed.