**UNITED STATES of America, Appellee,**

**v.**

**Jerome E. HEINEMANN and George Allen Delanoy, III,**
**Defendants-Appellants.**

**Nos. 1251, 1252, Dockets**
**86–1077, 86–1086.**

United States Court of Appeals,
Second Circuit.

Argued May 14, 1986.

Decided Sept. 12, 1986.

John G. Koeltl, New York City (Mary Jo White, Edwin G. Schallert, Linda Ross, Debevoise & Plimpton, New York City, Maurice H. Sercarz, Sercarz, Schechter & Lopez, Brooklyn, N.Y., of counsel), for defendants-appellants.

James L. Kainen, Asst. U.S. Atty. (Bruce A. Green and Stuart E. Abrams, Asst. U.S. Attys., Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., of counsel), for appellee.

Before VAN GRAAFEILAND, CARDAMONE, and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Jerome E. Heinemann and George Allen Delanoy, III appeal from their convictions by a jury before Judge Sand. Both appellants were convicted on one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (1982), and sentenced to three years imprisonment. The conspiracy involved the sale of "ministries" in purported tax-exempt "churches." On appeal, appellants raise several issues. First, both argue that there was insufficient evidence to support the single conspiracy alleged in the indictment rather than multiple conspiracies involving the sale of ministries in four different churches. Second, both claim that prejudicial evidence of their association with the "notorious fugitive" Robert Vesco was erroneously admitted. Heinemann makes two additional claims. He argues that Judge Sand's charge relating to "conscious avoidance" was erroneous, and that testimony concerning his conduct before a New Jersey grand jury was improperly admitted. Delanoy also raises two additional issues. He claims that Judge Sand erroneously admitted a taped conversation between a government informant and a co-defendant and certain other evidence prejudicial to Delanoy. We reject their contentions and affirm.

Between 1977 and 1981, Frank Conti operated a series of businesses that sold "ministries" in various churches to be used by the buyer as a means of reducing his federal tax liability. Such ministries were used to reduce taxes by two predominant methods: one was ironically dubbed the "vow of poverty" method, while the other was called the "50% system." Under the vow of poverty, by far the most lucrative technique, the "minister" would renounce interest in all income in favor of the church. Paychecks would then be deposited in the church account, which in turn was used to pay the minister's personal and family living expenses. In the first year of a ministry, the minister would file an income tax return claiming to have earned no income and requesting a refund of all income tax previously withheld during that year. In subsequent periods, a minister would claim sufficient exemptions on W-4 Forms so that no portion of wages would be withheld, and would pay no federal income tax. Under the 50% plan, the minister would deposit up to 50% of income in a church account and claim this amount as a charitable contribution deduction from adjusted gross income. Of course, the minister retained control over these "charitable contributions," characterizing disbursements of the funds as expenses of maintaining the parsonage.

The ministry business began in late 1977, when Conti expanded a business known as Money Card, which sold memberships in a discount buying club, to include the sale of ministries in the Universal Life Church

("ULC"). He operated the business with a pyramidal sales network, through which salespeople earned commissions both on their own sales of ministries and on the sales of additional salespeople whom they had recruited.

In early 1978, after meeting with William Drexler, the "Archbishop" of the Life Science Church ("LSC"), Conti began selling ministries in the LSC. By the end of 1978, Conti had renamed his business "Freedom of Choice" and was concentrating exclusively on selling LSC ministries, again employing the pyramidal structure used to sell ULC ministries. Conti had paid Drexler $25,000 for the privilege of being named the LSC "Bishop" for New Jersey, entitling him to be the exclusive representative in that state for the sale of LSC ministries. In January 1979, however, after a dispute with Drexler over the size of Conti's exclusive sales territory, Freedom of Choice left the LSC.

Conti then decided that his organization would promote Basic Bible Church of America ("BBCA") ministries instead. He held a meeting at which he urged the membership of Freedom of Choice to switch affiliation. Jerome Daly, the "Archbishop" of BBCA, spoke at the meeting, taking credit for Drexler's success with the LSC, criticizing defects in the plan promoted by Drexler, and outlining his own BBCA plan. After a dispute with Daly, however, Conti caused Freedom of Choice to revert to ULC ministries.

During this period, Conti applied to the Internal Revenue Service ("IRS") for a tax-exempt determination letter for his own church, the Freedom Church of Revelation ("FCR"). He also renamed his sales organization the Freedom Institute of America. The IRS issued FCR an individual tax-exempt determination letter on June 8, 1979. In October 1979, Conti gathered the members of his organization for a meeting at which he announced his new church, and encouraged all existing members of Freedom of Choice to join at a starting fee of $3,000. Those who had previously enrolled in ULC through Conti's organization were allowed to deduct their earlier payments from this membership fee. Freedom of Choice's pyramidal sales structure was also adopted by FCR and formalized into a "missionary program." Church members acted as "missionaries" who recruited new church ministers and thereby earned commissions, in the form of "donations" to their FCR "congregations," consisting of a percentage of the membership fees paid by the new ministers whom they had recruited. The size of that commission depended on the member's level in the pyramid.

Heinemann, a truck driver with St. Johnsbury Trucking, purchased an LSC ministry through Freedom of Choice in late 1978. Heinemann purported to take a vow of poverty, and opened a bank account in the name of LSC over which he and his wife were trustees. Heinemann requested a refund of all income tax withheld for 1978 and filed no tax returns for 1979–1983. After joining LSC, Heinemann consistently attended Conti's various church meetings and switched affiliation along with the Freedom of Choice organization to BBCA and then to ULC. Heinemann opened a ULC bank account in April 1979. During this period, Heinemann quickly rose in the ranks of Conti's organization. When FCR was formed, Heinemann became president of the Freedom Institute. He was also named a "Bishop" in FCR's governing "Bishops Council," and later became Dean of Freedom College, the "educational" arm of FCR that sought to teach outsiders the benefits of an FCR ministry. At weekly Bishops Council meetings, Heinemann met with Conti, co-defendant Delanoy, and Joseph Coniglione, a government witness at trial.

Delanoy joined the FCR in December 1979 by purchasing a position on the Bishops Council, which entitled him to the maximum portion of recruitees' membership fees. Like Heinemann, he took a vow of poverty, opened a church bank account, and filed no tax returns. Delanoy eventually rose to the position of Assistant to the Archbishop, and ran the FCR national office when Conti moved to Florida.

Each of the churches sold by Conti's organization was promoted to the general public as a means of avoiding taxes. Although FCR policy required new ministers to sign pledges that they joined for "religious, charitable and educational purposes," not for "personal financial gain," "ministers" were instructed in techniques to avoid taxation, most notably disguising the fact that they were personally benefiting from their charitable contributions or were earning income under their vows of poverty. For example, the ministers were instructed to sign church checks with "illustrator pens," which supposedly resisted microfilming, and to produce church records to no one except their "successor trustees." Moreover, the evidence clearly indicated that both Heinemann and Delanoy had lifestyles during their tenure with FCR inconsistent with genuine vows of poverty.

In 1980, the IRS not surprisingly began to audit various FCR ministers. The FCR hierarchy, including Heinemann and Delanoy, instructed these ministers to produce no information and to send all correspondence to them for review by FCR's legal staff. Early in 1980, Heinemann received subpoenas for financial records of the Freedom Institute, ULC, and two other organizations in connection with an investigation by the State of New Jersey. The IRS also began proceedings to revoke FCR's tax exemption determination letter. The Bishops Council met several times to discuss these developments. At one meeting, FCR's lawyer, William DeMarco, advised Heinemann and Delanoy that more be done to give FCR a religious appearance. A number of steps were taken, including plans to market a new church, the Church of God's Elect ("CGE").

On October 14, 1981, the IRS notified FCR that it proposed to revoke FCR's tax-exempt status. An appeal by FCR was denied on September 30, 1982, and FCR was notified that the IRS considered it to be operated for the benefit of private individuals, not for any exempt purpose. In response, FCR filed a declaratory judgment action seeking to overturn the IRS's administrative determination. During this period, numerous FCR ministers were audited and went to the Tax Court, where their deductions were consistently disallowed on the basis of self-enurement.

The Bishops Council developed a new system of churches in an attempt to overcome these difficulties. Conti acquired the Community Church of Truth ("CCT"), a church with group tax-exempt status, and appointed his wife as its head. CCT formed the American Association of Churches ("AAC") under its power to charter additional exempt organizations, and FCR became a member of AAC. Delanoy then instructed FCR ministers to send their "contributions" directly to AAC instead of to the ministers' own FCR accounts. AAC distributed these funds to its member churches, including FCR, after retaining 5% purportedly for world hunger relief. FCR ministers were told to "estimate high" in their budgets so as to receive their full share from AAC. While appearing to be separate religious entities, CCT, AAC, and FCR were run out of FCR's Florida office, and merely consisted of different bank accounts controlled by Conti.

Conti and Delanoy also began to promote CCT, selling individual churches to high-income individuals. In addition, Delanoy sold ministries in the Family Church of God ("FCG"), a less expensive church affiliated with CCT. Heinemann, however, was opposed to AAC, and sought a CCT-affiliated church from Conti. He eventually formed Pinelands Community Church with several FCR ministers.

FCR undertook a number of investment programs. These included a plan to sell interests in gold and silver mines in Mexico; a plan to sell tax-free "congregational bonds" to FCR ministers to raise funds for investing in English gold and silver futures; a plan to import shrimp and lobster from a company called Pescado Oceano and to fish Nicaraguan waters with Pescado Oceano; and a plan to sell shoes, hats, and belts as exclusive agent of Arnold Rodriguez B. and Associates. Delanoy and Coni-

glione also set up the Congregational Investment Fund, through which they earned fees by getting ministers to invest in a series of oil wells.

Heinemann, Delanoy, Conti, and five others were indicted on July 10, 1985, and charged with conspiracy to defraud the United States. The cases against Conti and three co-defendants were disposed of before trial. Trial proceeded, and Heinemann and Delanoy introduced various exhibits during the course of the government's case in support of their claim that they held a good faith belief that their activities were lawful. Heinemann, for example, claimed to have relied in good faith on FCR's tax exemption letter and the IRS's Cumulative List of Exempt Organizations, which included FCR.

The jury returned verdicts of not guilty as to two co-defendants, but found Heinemann and Delanoy guilty as charged. They were each sentenced to three years imprisonment. This appeal followed.

## I. VARIANCE BETWEEN INDICTMENT AND PROOF

The indictment alleged that from "on or about January 1, 1978, up to and including the date of the filing of this Indictment," all eight defendants conspired to impede, impair, obstruct, and defeat the IRS's lawful functions in assessing and collecting revenue, "to wit, the income taxes of themselves and other purported 'ministers' of LSC, BBCA, ULC, FCR and related 'churches.'" As alleged in paragraph 23:

> It was a part of this conspiracy that the defendants and their co-conspirators would and did promote LSC, BBCA, ULC, FCR, and related "churches" by claiming that through the use of a "ministry" individuals could either (a) take a "vow of poverty" and cease paying any and all federal income taxes, ... or (b) deduct on their income tax returns ... up to 50% of their gross income as "charitable contributions."

The indictment thus alleged a single conspiracy encompassing all of Conti's various churches.

Appellants' principal claim on appeal is that the proof failed as a matter of law to establish the existence of a single conspiracy. Rather, they claim, it revealed multiple conspiracies, each centered on LSC, BBCA, ULC, or FCR, with each church being "at war with the others." This variance, appellants conclude, was fatal to the validity of their convictions because it resulted in admission of substantial amounts of prejudicial hearsay as statements of co-conspirators when that hearsay in fact related to separate conspiracies. We disagree.

Judge Sand charged the jury that the government bore the burden of proving beyond a reasonable doubt the existence of "the single, overall conspiracy charged in [Count 1]," and pointed out that "[p]roof of two or more separate conspiracies" would not satisfy that burden. The jury was thus correctly charged, and it found that the single overall conspiracy had been proven. The only issue, therefore, is the sufficiency of the evidence to support this finding. In addressing that issue, of course, "we must view the evidence in the light most favorable to the government, ... and construe all permissible inferences in its favor." *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983) (citations omitted).

■ We conclude that ample evidence supports the finding of a single enterprise headed by Conti whose members agreed to utilize the "church" and "minister" format to evade income taxes. The core members of Conti's organization, including Heinemann, moved with Conti from LSC to ULC to BBCA, back to ULC, and finally to FCR. With each change in Conti's church affiliation, church members were urged to, and often did, "convert." Conti's organization consistently promoted the same tax avoidance plans using the same pyramidal sales system, whatever the name of the particular church. New affiliations were viewed

and marketed merely as safer and superior means for participants to avoid taxation and earn income. The names were often changed, but the enterprise's goal of avoiding taxes and making money through the sale of ministries was not.

 The appellants thus agreed on a "common purpose" that sufficed to render their activities "a single enterprise," *see Kotteakos v. United States,* 328 U.S. 750, 769, 66 S.Ct. 1239, 1250, 90 L.Ed. 1557 (1946), and the jury was not compelled to find that the various churches reflected "numerous separate adventures of like character." *Id.* "[A] single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis on its locale of operations." *United States v. Cambindo Valencia,* 609 F.2d 603, 625 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). *See also United States v. Armedo-Sarmiento,* 545 F.2d 785, 790 (2d Cir.1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977).

 Appellants argue that the various churches could not have been part of a single overall conspiracy because Conti's early churches were at times hostile to each other and competed for memberships. However, Conti and his associates, not the churches, are the ones alleged to have conspired to sell ministries for the purpose of defrauding the IRS. It is not inconsistent with such an ongoing, unitary conspiracy that disputes might arise between Conti and leaders of the churches being promoted, notably Drexler and Daly, and that switches in affiliation might occur from time to time.[1] The evidence reflected a single criminal enterprise that operated in much the same way as any wholesale distributor of a particular product that buys from various manufacturers, sometimes gets into disputes with its suppliers and changes the brand name used, but nevertheless retains its identity as a single entity.[2]

Defendants argue that *Cambindo Valencia* requires us to reverse. The evidence in *Cambindo Valencia,* however, clearly distinguishes it. There, the single source of narcotics was a "Latin American country," the similar methods used consisted of "smuggling on ships ... and removal either by walking off the cocaine or throwing it overboard to waiting swimmers," and the connection between the co-conspirators consisted largely of their connections with the Colombian port of Buenaventura, a city of 115,000 persons. 609 F.2d at 625–26. The evidence of a single conspiracy in the present case is infinitely more precise and more substantial.

1. Unlike *United States v. Camiel,* 519 F.Supp. 1238 (E.D.Pa.1981), *aff'd,* 689 F.2d 31 (3d Cir. 1982), members of the core group of co-conspirators involved in Conti's organization did not have goals "at cross purposes with the aims" of other members of that group. *Id.* at 1244. Moreover, in *Camiel,* there was "no one individual or group of individuals who can be said to have been the hub of" the scheme. *Id.* at 1243. Conti's role in the organization clearly distinguishes this case from *Camiel.*

2. Defendants argue that the conspiracy alleged in the indictment could not, as a matter of law, be classified as a single "wheel" or "chain" conspiracy. We need not determine which aspects of the conspiracy possess the characteristics of a "wheel" and which possess those of a "chain," for it is sufficient under either characterization that the evidence established an agreement to participate in the conduct of a "single enterprise."

Delanoy's claims that he did not know he was associating himself with an enterprise larger than his church are equally unpersuasive. There is, of course, no requirement that each co-conspirator participate in every phase of an evolving conspiracy, as long as each was aware that the conspiracy did not begin and end with his own activities. *See United States v. Agueci,* 310 F.2d 817, 827 (2d Cir.1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). Certainly the jury could have inferred that Delanoy, having joined FCR as a member of the Bishops Council, was generally aware of FCR's and Conti's past history. *Cf. United States v. Badalamenti,* 794 F.2d 821, 828 (2d Cir.1986) (co-conspirator statements made before "new recruit" joined conspiracy are admissible against that recruit where "he was generally aware of what his new partners had been doing and saying on behalf of his enterprise") (quoting 4 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 801(a)(2)(E)[01], at 250–51 (1985)).

## II. Admission of Evidence of Association With Robert Vesco

Defendants claim that Judge Sand improperly admitted evidence that Heinemann and Delanoy had engaged in business dealings in Costa Rica with "the notorious fugitive financier" Robert Vesco. Harry Partington, a former FCR official who cooperated with the government, testified about a trip that Heinemann, Delanoy, and Coniglione had taken to Costa Rica, ostensibly to set up an "FCR nutritional center." The testimony made repeated reference to "Vesco's people," who apparently picked up the FCR officials at the airport, spent time with them, and discussed "a shrimp distribution plant to launder money," which would have called for the three FCR members to invest $500,000. Defendants argue that Partington's testimony was inadmissible under Fed.R.Evid. 403 because its probative value is outweighed by its prejudicial effect. They suggest that "[i]ts admission can be understood as an effort to smear Heinemann with the well-known Vesco taint."

■ Judge Sand admitted the evidence as a rebuttal to appellants' claim that they were church ministers who lived under a vow of poverty and who believed in good faith that their church scheme was legal. The weighing of relevance against prejudice is entrusted to the discretion of the trial judge, whose rulings will not be overturned unless he or she acted "arbitrarily or irrationally." *United States v. Esdaille*, 769 F.2d 104, 108 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985). There is nothing unreasonable in finding that this testimony was fairly probative of whether Delanoy and Heinemann were living according to their vows of poverty or were instead seeking to invest large sums in a money laundering venture. Further, as Judge Sand correctly noted, "one could argue that the very nature of the proposed transaction, the very fact of the notoriety attached to Vesco belies the defendants' contentions as to their sincerity and the nature of the activities in which they were engaged." It was thus entirely reasonable for Judge Sand to conclude that this testimony's relevance was not substantially outweighed by the danger of unfair prejudice.

## III. Heinemann's Claims

### A. *Conscious Avoidance Charge*

Heinemann claims that his key defense, that he had "a good faith belief that what he was doing was lawful," was prejudiced by Judge Sand's instruction to the jury that a defendant may not "deliberately close his eyes to what would otherwise be obvious and still be said to have acted in good faith," an instruction supposedly foreclosed in conspiracy cases by *United States v. Mankani*, 738 F.2d 538, 547 & n. 1 (2d Cir.1984).

■ In *United States v. Lanza*, 790 F.2d 1015 (2d Cir.1986), we addressed the use of a "conscious avoidance" charge in conspiracy cases. We noted that there are "two aspects of knowledge involved in a conspiracy: (1) knowing participation or membership in the scheme charged and (2) some knowledge of the unlawful aims and objectives of the scheme." *Id.* at 1022. We held that the decision in *"Mankani ...* relates to the knowing participation or membership aspect of the scheme charged," and that a conscious avoidance charge is improper with regard to that element. *Id.* We also noted, however, that such a charge may be given in an appropriate case with regard to the second element. *Id.* at 1023.

■ Here, as in *Lanza*, Heinemann's participation in the alleged conspiracy is clear, and Judge Sand specifically charged the jury that

mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient.

... What is necessary is that a defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends.

This charge made it clear to the jury that Heinemann must have consciously intended to participate in the scheme, and the conscious avoidance charge related only to whether he honestly believed that his conduct was legal. A conscious avoidance charge is appropriate where a defendant asserts "ignorance of the specific objectives alleged in the indictment." *Id.* Heinemann's claim that he lacked knowledge of the unlawfulness of the tax avoidance scheme is just such an assertion, and the charge was thus correct. *See United States v. MacKenzie*, 777 F.2d 811, 818 n. 2 (2d Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986).

### B. *Testimony and Summation Concerning Conduct Before the New Jersey Grand Jury*

Heinemann argues that Coniglione, a member of FCR's Bishops Council and a key government witness, was improperly allowed to testify that Heinemann told him that he had received a subpoena for various FCR records issued by a New Jersey grand jury, but produced no records because he falsely convinced a New Jersey judge that none existed.

Heinemann had received four subpoenas for bank records of Freedom of Choice, the Freedom Institute, LSC, and ULC. When he refused to produce the records on, *inter alia*, fifth amendment grounds, he was jailed for civil contempt. On advice of new counsel, Heinemann later testified that either he did not have the records or the records no longer existed. Heinemann claims that Coniglione's account of these events amounted to an accusation of perjury before the New Jersey grand jury and was erroneously admitted because it impermissibly burdened Heinemann's fifth amendment rights, and was inadmissible under Rules 404(b) and 403, Fed.R.Evid., as evidence of "other crimes, wrongs, or acts." We reject each of these claims.

Coniglione's testimony never mentioned Heinemann's invocation of the fifth amendment privilege before the New Jersey grand jury. Coniglione testified that he had appeared before a federal grand jury and had refused to produce FCR records, asserting, *inter alia*, a fifth amendment privilege. He had also been found in civil contempt. During the summation, the prosecutor commented on the irony inherent in Heinemann's position with regard to Coniglione's credibility, stating

> [Heinemann's counsel says] [y]ou should believe, for example, that [Coniglione] did all this in the grand jury, that he lied about documents, that he didn't produce documents, but you shouldn't believe him when he tells you that defendant Heinemann did the same thing earlier in the New Jersey investigation.

Heinemann argues that the jury "must have understood [the prosecutor] to mean [that Heinemann had done] what Coniglione had done—failed to produce records based on a Fifth Amendment privilege." Brief of Appellant at 38.

This claim is totally implausible. The prosecutor made specific reference to only two things that Coniglione allegedly had done before the grand jury—"he lied about documents ... [and] refused to produce documents." He then suggested that Heinemann had done "the same thing." "The same thing" clearly referred not to *all* of Coniglione's behavior, but only to that which the prosecutor had just mentioned, namely lying about and failing to produce documents. Although the jury knew that Coniglione had also asserted a fifth amendment privilege, there is no reason to believe that the prosecutor's language could lead a jury to infer that Heinemann had claimed such a privilege.

Heinemann also suggests that the exercise of his fifth amendment rights was burdened because he was placed in the awkward position of having to refute Coniglione's testimony that he had committed perjury before the grand jury. He argues that he was faced with the dilemma of revealing that he had asserted a fifth amendment privilege or leaving the jury with the impression that he had failed to cooperate with the grand jury. However, this argument ignores the fact that Heinemann ultimately abandoned his fifth

amendment claim in the New Jersey proceedings and testified that the subpoenaed records either did not exist or were not in his possession. Consequently, Heinemann's abandoned fifth amendment claim was simply irrelevant to the subject of Coniglione's testimony; revealing that he had asserted a fifth amendment privilege when he *did not* testify would not have rebutted the inference that he had not cooperated with the grand jury when he finally *did* testify. To rebut that inference, Heinemann would have had to establish either that he produced records, which he did not, or that his grand jury testimony was accurate.

Heinemann also argues that even if Coniglione's testimony did not violate his fifth amendment rights, it was nevertheless inadmissible. First, he claims that the alleged perjury before the grand jury was not sufficiently similar to the conspiracy charged in the indictment to satisfy Rule 404(b). He relies upon *United States v. Corey*, 566 F.2d 429, 431 (2d Cir.1977), for the proposition that Rule 404(b) does not allow the "introduction of every prior similar act which may contribute in some manner to a showing of intent." Such evidence of "other crimes, wrongs, or acts" is admissible only if there is a " 'close parallel' between the crime charged and the acts shown." *Id.*

■ Heinemann's argument, however, misapprehends the relevance of Coniglione's testimony. Testimony that Heinemann deliberately misled the New Jersey grand jury as to the existence of various FCR church records is evidence not of "other crimes, wrongs, or acts," but of the very conspiracy charged in the indictment. The government established that, as part of defendants' conspiracy to defraud the IRS, they concealed the fact that the "church funds" were not expended for the benefit of a legitimate church. These efforts at concealment included, among other things, an oath to maintain the financial secrecy of other ministers, an agreement not to reproduce church records, and, as Coniglione testified, the refusal to submit records to

the New Jersey grand jury investigating the FCR. The testimony, then, constituted evidence of Heinemann's direct participation in an act in furtherance of the charged conspiracy, not evidence of other acts.

With regard to whether the evidence was inadmissible under Rule 403, it was highly probative both of Heinemann's participation in the conspiracy and of his lack of a good faith belief in the legality of the FCR scheme. The probative value thus easily outweighed any possible prejudice.

## IV. DELANOY'S CLAIMS

### A. *Introduction of Santeramo Conversation*

The government was permitted to introduce at trial a tape recording of a conversation between I. Cook Fafinsky, an FCR member turned government informant, and co-defendant Guy C. Santeramo. Delanoy argues that the conversation, during which Fafinsky and Santeramo discussed, *inter alia*, rumors that Delanoy was involved in a new church, was not in furtherance of the conspiracy and, as such, constitutes hearsay that is inadmissible against Delanoy. Fed.R.Evid. 801(d)(2)(E).

■ We have recently held that "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied when a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance." *United States v. Paone*, 782 F.2d 386, 391 (2d Cir.1986). On the other hand, the "in furtherance" requirement is not satisfied by a "merely narrative" account by one co-conspirator "of the facts of [another's] past activities." *United States v. Birnbaum*, 337 F.2d 490, 495 (2d Cir.1964); *see also United States v. Lieberman*, 637 F.2d 95, 102–03 (2d Cir.1980).

■ We cannot conclude that Judge Sand committed error when he admitted the statements made by Santeramo during his conversation with Fafinsky. In the conversation at issue, which took place when the tax exempt status of FCR was the

subject of litigation and when Santeramo still believed Fafinsky to be a co-conspirator, Santeramo proposed that Fafinsky purchase a CCT church in order to continue to protect himself from tax liability. Santeramo and Fafinsky also discussed other means of overcoming the legal problems then facing FCR, including purchasing a ministry in Delanoy's Family Church of God. It is thus clear that the essence of this conversation involved an attempt to convince Fafinsky to continue and deepen his participation in the FCR organization by purchasing a CCT church. It is also clear that at the very least Santeramo was informing Fafinsky, as a co-conspirator participating in FCR, of the actions then being taken to preserve FCR's tax-avoidance scheme. Thus, the conversation was designed to "apprise [Fafinsky] of the progress of the conspiracy ... and to induce his assistance," *Paone*, 782 F.2d at 391.

B. *Testimony Regarding Diversified Marketing*

Delanoy also claims that Judge Sand erroneously admitted evidence regarding his involvement in a partnership known as Diversified Marketing Limited ("DML"). In particular, he claims that he was prejudiced by testimony that DML sold, among other things, a "women's line, which was in sexy women's lingerie and also marital aids." Delanoy argues that the prejudicial impact of this statement substantially outweighed the "marginal relevance" of this evidence.

However, no immediate objection was made to the testimony at issue. When the government subsequently sought to introduce seven checks with which Coniglione paid for a DML distributorship and partnership, Delanoy did join in a co-defendant's objection "on relevancy grounds." Judge Sand overruled the objection, noting that the "checks are drawn on the church account." At no time did Delanoy make an objection specifically directed to the description of DML's product line. The objection made by Delanoy was therefore inadequate to satisfy Rule 103(a)(1)'s require-

ment of a "timely objection ... stating the specific ground."

Affirmed.