**STATE of Minnesota, Respondent,**

v.

**Robert Lee VALENTINE, Appellant.**

No. C0–00–1198.

Court of Appeals of Minnesota.

June 5, 2001.

Review Denied Aug. 22, 2001.

Mike Hatch, Attorney General, St. Paul, and Amy Klobuchar, Hennepin County Attorney, David C. Brown, Assistant County Attorney, Minneapolis (for respondent).

Bradford Colbert, Assistant State Public Defender, St. Paul (for appellant).

Robert L. Valentine, Bayport (pro se appellant).

Considered and decided by
SHUMAKER, Presiding Judge,
RANDALL and PETERSON, Judges.

## OPINION

RANDALL, Judge

Appellant challenges his conviction and sentence for attempted first-degree murder and attempted second-degree murder, arguing that the district court abused its discretion by not admitting evidence offered by appellant that (1) others had mo-

tive to shoot the victim because he was not well-liked at work and (2) appellant had a strong Cajun accent. Appellant also argues that the district court erred by determining that the victim's injuries constituted substantial and compelling factors to justify an upward-durational departure from the presumptive sentence for attempted first-degree murder. Appellant also raises a number of arguments in his pro se supplemental brief. We affirm the conviction, but we reverse the upward departure, and remand for resentencing.

## FACTS

On the morning of November 23, 1999, J.D. left his house and walked to his car in his driveway. A man came out from behind a tree in J.D.'s yard and, as he approached J.D., stated, "Do you remember me? I'm the guy who's gonna shoot you." The man then shot J.D. once in the chest and once in the face. J.D. was able to make his way back to his house, where he asked his wife to call 911 and then collapsed. At the scene, two spent casings, two fired lead bullets, and one unfired round of PMC-brand nine-millimeter ammunition were recovered. As a result of the shooting, J.D. lost a lung, lost vision in his right eye, and has partial paralysis in his left leg.

While J.D. was in the hospital, police detectives spoke to him several times. On the first visit, J.D. indicated that he knew the shooter and that the shooter was black. The detectives contacted J.D.'s employer and learned of three black males who had been fired within the last year of the shooting, one of whom was appellant Robert Lee Valentine. Appellant had been fired on December 31, 1998, because he took a vacation over Christmas despite being told that his request for time off had been denied. As a result of the detectives' visits with J.D. in the hospital, they learned that the shooter once worked with J.D. as an unarmed security guard and that the shooter had been involved in a dispute with his employer over time off at Christmas.

Based on J.D.'s description, the detectives created a photographic display, which included appellant's picture. At first, J.D. identified appellant from the display, but indicated that he was not sure of his identification because he had blurry vision out of his good eye. The next day, when J.D.'s vision had cleared, he positively identified appellant from the display. The detectives then obtained a search warrant for appellant's apartment. They found a nine-millimeter pistol, a clip containing ten rounds of PMC-brand nine-millimeter ammunition, and a box of nine-millimeter ammunition with two rounds missing, matching the brand of the two rounds found at the scene. When appellant was arrested, he was driving a silver pick-up truck with a blanket behind the seat and a toolbox extending across the bed of the truck.

Appellant was charged with attempted first-degree murder and attempted second-degree murder. At trial, a certified firearms examiner testified regarding tests performed on the bullets found at appellant's apartment and the gun that was recovered. The examiner testified that, after test firing, the gun did not leave enough marks on the bullets to provide a positive match to the bullets found at the scene. But, the marks on the shell casings did positively match the marks on the shell casings that were recovered. J.D.'s neighbor testified that, on the day before the shooting, he saw a silver pick-up truck with tinted windows, a blanket on the seat, and something resembling a topper on the back parked on the lawn on the side of his house. While the neighbor was looking at the truck, a black male shouted at him.

The neighbor did not recall hearing the man speak with an accent.

Appellant had a number of witnesses testify to his character as a peaceful man. In addition, appellant sought to introduce evidence that others had a motive to shoot J.D. because he was not well liked at work. Appellant also sought to provide a voice exemplar to the jury to demonstrate that he had a strong Cajun accent. The district court ruled that if he did provide a voice exemplar, then he would be subject to cross-examination. Because appellant chose not to take the stand, the district court ruled appellant's voice exemplar inadmissible. The district court did allow appellant to then recall five witnesses to testify regarding his accent.

After the jury returned a guilty verdict on both counts, the district court departed upward from the presumptive sentence for the attempted first-degree murder conviction, based on the serious injuries to J.D. Appellant was sentenced to 240 months, an upward departure of 60 months from the 180 month presumptive sentence. This appeal from the conviction and sentence followed.

## ISSUES

I. Did the district court err by not admitting evidence offered by appellant that the victim was not well liked at work?

II. Did the district court err by not admitting a voice exemplar offered by appellant to demonstrate that he had a strong Cajun accent unless appellant would first consent to waiving his Fifth Amendment privilege against self-incrimination?

III. Did the district court err by determining that there were substantial and compelling aggravating factors present to justify an upward-durational departure from the presumptive sentence for attempted first-degree murder?

IV. Did appellant raise any meritorious claims in his pro se supplemental brief?

## ANALYSIS

### I. Motive of Third Persons

█ The district court has broad discretion in evidentiary rulings, and a reviewing court will reverse only for an abuse of that discretion. *State v. Nunn*, 561 N.W.2d 902, 906–07 (Minn.1997). Although defendants have a right to present a complete defense, that right is not unlimited. *State v. Bjork*, 610 N.W.2d 632, 636 (Minn.2000).

Appellant argues that the district court erred by not allowing him to introduce evidence that J.D. was "difficult to get along with and was caustic toward others, that he had a bad temper and would occasionally" verbally act out toward coworkers. Appellant sought to introduce this evidence to show that other persons had a motive to shoot J.D. The district court ruled that the evidence was inadmissible under Minn. R. Evid. 404.[1] The court concluded that appellant might be able to offer evidence that a specific coworker had animosity toward J.D., but evidence that "others" did not get along with J.D. would be too vague to be admissible.

█ "[A] defendant may seek to introduce evidence that a third person * * * committed the crime of which defendant is accused." *Woodruff v. State*, 608 N.W.2d 881, 885 (Minn.2000) (citation omitted).

---

1. The district court did not specify whether its ruling was based on Minn. R. Evid. 404(a) or (b). Although a victim's pertinent character trait is admissible under Minn. R. Evid. 404(a), appellant's argument focuses on possible motivation of third persons to commit the charged crime. Accordingly, Minn. R. Evid. 404(b) seems to be more applicable.

Evidence of this nature is generally referred to as reverse-Spreigl evidence, and such evidence may include a third person's motive to commit the crime. *Id.* But absent proof of facts to connect a third person with the crime, evidence that tends to incriminate another is inadmissible. *State v. Hawkins,* 260 N.W.2d 150, 159 (Minn. 1977). Before reverse-Spreigl evidence is admitted, the defendant must show

> (1) by clear and convincing evidence that the third party participated in the reverse-*Spreigl* incident; (2) that the reverse-*Spreigl* incident is relevant and material to defendant's case; and (3) that the probative value of the reverse-*Spreigl* evidence outweighs its potential for unfair prejudice.

*Woodruff,* 608 N.W.2d at 885 (citation omitted).

■ Appellant's argument is not persuasive. Appellant did not identify any particular person who had a motive to shoot J.D. Instead, appellant argued that several coworkers "may have had" a motive to shoot J.D. because of J.D.'s attitude at work. Appellant could not offer any proof that would connect any one coworker to the actual crime. The district court did not err by rejecting appellant's offer to put witnesses on the stand who would testify generally that other coworkers "did not like J.D." Those statements, offered as reverse-Spreigl evidence, lack the specificity to bolster the assertion past pure speculation that a general dislike for someone could lead to attempted murder.

## II. Voice Exemplar

Appellant sought to conduct a voice demonstration for the jury to show that he had a strong Cajun accent. He intended to use a voice exemplar to support his argument that he was not the man J.D.'s neighbor saw on the night before the shooting because J.D.'s neighbor testified that he did not hear the man speak with an accent. The district court ruled that if appellant provided a voice exemplar directly to the jury, his Fifth Amendment privilege was waived and he would subject himself to cross-examination. Because appellant refused to waive his privilege against self-incrimination, the court ruled that he could not introduce a voice exemplar. Appellant argues that the district court's ruling was erroneous and so prejudiced his defense that his conviction should be reversed.

The specific issue of whether a defendant opens himself to cross-examination if he attempts to introduce a voice exemplar has not been addressed by Minnesota caselaw. We start our analysis by noting that the United States Supreme Court has described a voice exemplar as demonstrative, not testimonial, evidence. *United States v. Dionisio,* 410 U.S. 1, 6–7, 93 S.Ct. 764, 767–68, 35 L.Ed.2d 67 (1973).

A review of other jurisdictions' caselaw reveals differing theories on how to approach the issue. For example, some jurisdictions have focused on the relevancy and probative value of the voice exemplar. The district court in *United States v. Esdaille,* 769 F.2d 104 (2d. Cir.1985), *cert. denied,* 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985) relied on Fed.R.Evid. 403 and ruled that defendant's proposed voice exemplar had "little probative value because it was inherently suspect." *Id.* at 106, 769 F.2d 104. The reviewing court affirmed, holding that the district court did not abuse its discretion. *Id.* at 108, 769 F.2d 104. We note that *Esdaille* has limited application to the facts of this case because the decision rested on the "generic" issue of relevancy rather than the defendant's constitutional privilege.

Other courts have focused on the constitutional privileges afforded to criminal defendants. In *State v. Tillett,* 351 So.2d 1153 (La.1977), the defendant wanted to

introduce a voice exemplar to demonstrate that he did not have a Spanish accent. The district court ruled that in order for the defendant to introduce this evidence, he had to subject himself to cross-examination. *Id.* at 1155. The Louisiana Supreme Court reversed outright, holding that a defendant may introduce a voice exemplar for the purpose of revealing a physical characteristic without waiving his Fifth Amendment privilege. *Id.* at 1157. The court reasoned that Louisiana allows the state to compel defendants to exhibit a variety of physical characteristics, such as the presence of scars, bruises, and tattoos; how they open cigarette packs; and how they would say certain words, all without infringing on the defendants' privilege against self-incrimination. *Id.* at 1156. Thus, the Louisiana court believed that it was inherently unfair to compel a defendant to help incriminate himself with demonstrative evidence (yet not be able to claim the benefit of the Fifth Amendment privilege against self-incrimination) and then turn around and tell the defendant that his demonstrative evidence did implicate the Fifth Amendment, and, thus, he would have to waive his Fifth Amendment privilege to get it into evidence. The Louisiana Supreme Court stated:

> Since the state could have compelled defendant to display the quality of his voice without infringing on his fifth amendment privilege, his offering to make such a demonstration could not have constituted a waiver of his privilege against self-incrimination.

*Id.* The court added:

> Once a defendant knowingly and intelligently waives his privilege, he is of course subject to cross-examination on the whole case like any other witness. However, defendant Tillett's request to reveal a physical characteristic would not have been testimony in his behalf,

but merely a voice recital for the purpose of revealing a physical characteristic as evidence in the case. Therefore, his proposal to demonstrate his [lack of accent] did not waive his fifth amendment [privilege] and make him liable to cross-examination. It has long been held that one of the *essential ingredients of due process is reciprocity,* and we hold that if the state can compel a criminal defendant to demonstrate his physical characteristics before the jury without infringing on his fifth amendment [privilege], a defendant's offer of such a demonstration does not constitute a waiver of that same [privilege].

*Id.* at 1157 (emphasis added) (citations omitted).

The *Tillett* court concluded that the district court's error severely prejudiced appellant's case. The court reasoned that the state's entire case

> was based upon identification, and one of the two people who identified the accused * * * said that he did so on the basis of his forehead, his eyes, and his Spanish accent.

*Id.* The court found that the district court's "refusal to allow defendant to demonstrate his voice to the jury for [its] determination as to its qualities [constituted] reversible error." *Id.*

■ In our case, as in *Tillett,* the district court determined that if appellant offered a voice exemplar, he would be subject to cross-examination. We find the Louisiana Supreme Court's rationale in *Tillett* persuasive and adopt its reasoning. We conclude the district court here committed plain error by refusing to allow appellant's voice exemplar into evidence unless appellant waived his right against self-incrimination.

■ It is settled that the prosecution can compel a defendant to produce a voice

exemplar without violating the defendant's Fifth Amendment privilege. *See Dionisio*, 410 U.S. at 5–7, 93 S.Ct. at 767–68 (upholding grand-jury subpoena compelling submission of voice exemplar); *United States v. Wade*, 388 U.S. 218, 222–23, 87 S.Ct. 1926, 1929–30, 18 L.Ed.2d 1149 (1967) (requiring defendant to utter words used by bank robber did not violate defendant's Fifth–Amendment privilege). Thus, as the Louisiana Supreme Court noted in a strong opinion, a defendant should be afforded the same opportunity. Like the *Tillett* court, we conclude that if the prosecution can compel a defendant to produce a voice exemplar without infringing on his privilege against self-incrimination, then the due process principle of reciprocity demands that a defendant should be allowed the same opportunity without waiving his Fifth–Amendment privilege.

Although we find error, the following facts taken from the record mitigate the seriousness of this error. J.D.'s neighbor testified that he saw a black male near J.D.'s house on the evening before the shooting and the man yelled something at him about his pick-up truck. Although the neighbor did not remember the man having an accent, the conversation between the two men was brief, and they were approximately 50 feet apart. There was no evidence that the neighbor had a lengthy face-to-face conversation where even someone not attuned to regional accents might have picked up on an accent. What a stranger hears when someone several feet away briefly shouts is not going to prove, or shed light on, the presence or the absence of an accent. Although the neighbor did not pick up on an accent when the man he saw briefly yelled at him, the neighbor was certain about his identification of the vehicle. The neighbor testified that he saw a silver pick-up truck with tinted windows, a blanket on the seat, and something resembling a topper on the

back parked near his house. When appellant was arrested, he was driving a pick-up truck that closely matched the neighbor's description.

Further, the error in disallowing appellant's voice exemplar is lessened because the court did allow appellant to present evidence of his Cajun accent by recalling five witnesses to testify on the matter. The district court allowed appellant this option after it made its decision to keep out his voice exemplar. Essentially, appellant was able to introduce the same voice evidence in a different form. He was allowed to introduce solid evidence through various witnesses that he had a distinctive accent.

■ It is pure speculation that the jury could have reached a different verdict if it had been allowed to hear appellant's offered voice exemplar. With the five witnesses appellant selected all testifying, the voice exemplar, although helpful, would simply have been cumulative. We conclude that the district court's error in ruling that appellant would have to waive his Fifth Amendment privilege and testify if he wanted his voice exemplar to be heard by the jury did not constitute reversible error. *See State v. Post*, 512 N.W.2d 99, 102 (Minn.1994) (stating that error is harmless if reviewing court is satisfied beyond reasonable doubt that, even if potential of excluded evidence was fully realized, jury would have reached same verdict).

## III. Upward Sentencing Departure

■ The analysis of appellant's challenge to the upward departure must begin with a focus on appellant's conduct. As set forth by the Minnesota Supreme Court, a sentencing court's durational departure is justified if a defendant's "*conduct* somehow may be said to be significantly more serious than typically involved

in the commission of" the charged offense. *State v. Best,* 449 N.W.2d 426, 427 (Minn. 1989) (emphasis added). *See also State v. Spain,* 590 N.W.2d 85, 88–89 (Minn.1999) (stating sentencing court "should consider whether the defendant's *conduct* was significantly more or less serious than that typically involved in the commission of the crime in question" (emphasis added) (quotations omitted)); *Rairdon v. State,* 557 N.W.2d 318, 326 (Minn.1996) (stating court "should consider whether the defendant's *conduct* was significantly more or less serious than that typically involved in the commission of the crime in question" (emphasis added) (quotation omitted)); *State v. Smith,* 541 N.W.2d 584, 589 (Minn.1996) (stating district court must look to see "whether a defendant's *conduct* was significantly more or less serious than that typically involved in the commission of the crime in question" (emphasis added) (citation omitted)); *State v. Rasinski,* 472 N.W.2d 645, 649 (Minn.1991) (stating decision to depart is based on "whether the defendant's *conduct* was significantly more or less serious than that typically involved in the commission of the crime in question" (emphasis added) (quotation omitted)); *State v. Carpenter,* 459 N.W.2d 121, 127–8 (Minn.1990) (stating district court's decision to depart must be based on its determination of "whether the defendant's *conduct* was significantly more or less serious than that typically involved in the commission of the crime" (emphasis added) (quotation omitted)).

■ The supreme court stated:

It is inaccurate to say that the [district] court has broad discretion in deciding whether or not to depart. A more accurate statement is that the [district] court has broad discretion to depart *only if* aggravating or mitigating circumstances are present; if aggravating or mitigating circumstances are not present, the [district] court has no discretion to depart.

*Best,* 449 N.W.2d at 427. In addition, substantial and compelling circumstances must be evident in the record to support the district court's departure from the presumptive guidelines. *Rairdon,* 557 N.W.2d at 326.

Appellant argues that the district court erred by departing from the presumptive sentence because there were no substantial and compelling circumstances to justify the departure. Appellant asserts that his *conduct* was not significantly more serious than that typically involved in attempted first-degree murder. We agree. The record shows the district court's reason for departing upward from the presumptive sentence had nothing to do with appellant's conduct. Rather, it simply had to do with the extent of the victim's injuries. The injuries were severe. They included a lost lung, lost sight in his right eye, and partial paralysis in his left leg. But the injuries were sustained when appellant, in a typical fashion of someone attempting to kill someone, fired two shots in the direction of the victim and then turned and fled.

Attempted first-degree murder requires a defendant to take a "substantial step toward" causing the death "of a human being with premeditation and with intent to effect the death of the person." Minn. Stat. § 609.17 (1998) (defining attempt); Minn.Stat. § 609.185(1) (1998) (defining first-degree murder). The statute makes no reference to the *result* of a defendant's actions. None of the essential elements depend on how seriously the victim was injured, or whether the defendant was even injured at all. Looking at other criminal statutes, such as those for assault, it is evident that a legislature can include the degree of harm as part of the elements of a particular offense, if it chooses to do

so. *See* Minn.Stat. § 609.221, subd. 1 (2000) (including great bodily harm as element for first-degree assault); Minn.Stat. § 609.222, subd. 2 (2000) (including substantial bodily harm as element for second-degree assault); Minn.Stat. § 609.223, subd. 1 (2000) (including substantial bodily harm as element for third-degree assault); Minn.Stat. § 609.2231, subds. 1, 2, 2a, 3, 5, 6 (2000) (including demonstrable bodily harm as element for fourth-degree assault). Here, the degree of harm to the victim is not part of the elements for attempted first-degree murder. This benefits the prosecution as well as a defendant. If the jury believed that the prosecution has proved each essential element of murder beyond a reasonable doubt, the prosecution could get an attempted first-degree murder conviction, whether appellant's two shots completely missed J.D. or only produced minor flesh wounds.

Here, appellant fired two shots and fled. That is all. Nothing about his actions was atypical of conduct in other attempted first-degree murder cases. If appellant had walked over to J.D., fired a few more shots into his fallen body, kicked him, and continued to inflict more harm after J.D. was down and helpless, we would have a different case. Appellant's *conduct* then would not have been typical, and then would have been significantly more egregious than the conduct (attempted first-degree murder) defined by the statute. *See State v. Lee*, 491 N.W.2d 895, 902 (Minn.1992) (affirming district court's sentence departure for attempted murder where defendant broke knife off in victim's spine and attacked victim while she was huddled over her child); *State v. Herberg*, 324 N.W.2d 346, 350 (Minn.1982) (affirming district court's sentence departure for first-degree criminal-sexual conduct where defendant terrified victim, forced victim to submit to various types of penetration, and subjected victim to gross and vile physical abuse, which included cutting her vagina, forcing her to stick pin into one of her nipples, hitting her gratuitously, choking her, and forcing her to ingest excrement and urine); *State v. McClay*, 310 N.W.2d 683, 685 (Minn.1981) (affirming district court's sentence departure for aggravated robbery where defendants put more people in fear, kidnapped one person, and assaulted several others during their escape).

We recognize that J.D.'s wounds were substantial. But substantial injuries can be expected when the jury finds that one human being, with premeditation and intent, makes a serious effort to kill another human being. Appellant's conduct was not atypical for the crime he was charged with. On this record, it is undisputed that appellant did nothing more than fire two shots and flee. The accuracy of appellant's aim is not the dividing line between a typical shooting and an untypical one. We are aware that the state relies on *State v. Brown*, 455 N.W.2d 65 (Minn.App.1990) to argue that the departure should be upheld because J.D. suffered serious and permanent injuries. We note that *Brown* appears to focus only on the injuries and not on the defendant's conduct. We feel constrained, however, by the plain wording of the aforementioned cases which discuss the *conduct* of a defendant, and that is what we do here.

■ We conclude the district court abused its discretion by departing upward from the presumptive sentence based solely on the extent of the victim's injuries, rather than examining appellant's conduct. Appellant's conduct is serious, but his conduct did nothing more than fulfill the essential elements of the statute defining attempted first-degree murder. There is nothing in the record to support *any* inference that appellant's conduct was atypical of attempted first-degree murder. We re-

verse the upward departure and remand to the district court for resentencing.

## IV. Pro Se Arguments

Appellant raises a variety of assertions in his pro se supplemental brief. Based on our review of each of his claims, we conclude that none of them are persuasive.

## DECISION

First, we affirm the conviction. The district court correctly ruled that evidence involving appellant's general assertion that J.D.'s coworkers did not like him was inadmissible.

Second, the district court erred in ruling that appellant could not introduce a voice exemplar without waiving his Fifth Amendment privilege and subjecting himself to cross-examination. But based on the other evidence against appellant, and appellant's ability to put witnesses on the stand to testify about his accent, the district court did not commit reversible error.

Finally, the district court abused its discretion by departing upward from the presumptive sentence based on factors other than appellant's conduct. We find there were no untypical factors, under the statute defining attempted first-degree murder, in appellant's conduct in firing two shots and then running away.

**Affirmed in part, reversed in part, and remanded.**